AMERICAN STEEL & WIRE CO. OF NEW JERSEY v. DENNING WIRE & FENCE CO.

(Circuit Court, N. D. Iowa, Cedar Rapids Division. March 3, 1908.)

No. 34.

1. PATENTS—VALIDITY—MODE OF MAKING PATENTED ARTICLE.

The validity of a patent for a product or structure is not affected by the process or means by which it is made, or whether it is made by hand or by machinery.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 170.]

2. SAME—INVENTION—WOVEN-WIRE FENCING.

The Bates patent No. 561,193 for woven-wire fencing having parallel strand-wires and a series of single plain stay-wires connecting the strand-wires together by being coiled at their end portions around the strand-wires and intercoiled at their meeting ends and in one form having the spaces between both the strand-wires and the stay-wires graduated so as to form graduated meshes, in view of the prior art is void for lack of invention.

In Equity. On final hearing.

Suit for an alleged infringement of claims 1 and 3 of letters patent, No. 561,193, issued to Albert J. Bates June 2, 1896, from whom complainant derives title, for improvements in woven-wire fence. The application was filed January 6, 1896. The defenses are (1) that the patent is lacking in patentable novelty and involves only mechanical skill; (2) that it is anticipated by prior patents and use of other well-known wire fences; and (3) noninfringement.

Thos. W. Bakewell, Paul Bakewell, Chas. McVeagh, and Jas. H. Preston, for complainant.

Thos. A. Banning, Banning & Banning, and Grimm, Trewin & Moffit, for defendant.

REED, District Judge. The claims of the patent alleged to have been infringed by defendant are:

"1. The herein-described woven-wire fencing comprising the several plain parallel strand-wires S, and the plurality of single plain stay-wires D, arranged connecting said strand-wires together by being coiled, at their end portions, about said strand-wires and intercoiled at their meeting ends, substantially as set forth."

"3. The herein-described woven-wire fencing, comprising the series of parallel strand-wires arranged in graduated order, and the plurality of single graduated stay-wires arranged connecting said strand-wires together by being coiled, at their end portions, about said strand-wires, and intercoiled at their meeting ends; whereby fencing is made having graduated meshes substantially as set forth."

Those of defendant's patent are:

"1. A woven-wire fence fabric comprising running wires and stay-wires, connecting them together, the said stay-wires having their meeting ends coiled together, and said coiled meeting ends of said stay-wires being coiled around said running wires, substantially as described.

"2. A woven-wire fence fabric comprising running wires and stay-wires connecting them together, the said stay-wires having their meeting ends first coiled together and finally coiled around the running wires, substantially as described."

Others of the defendant's claims are substantially the same.

The issuance of the patent to Bates is presumptive evidence of its validity and of the novelty of the invention. To overcome this the defendant pleads and offers in evidence 16 prior patents beginning with that to M. P. Coons, No. 5,863, October 17, 1848, and contends that each of them anticipates the Bates patent. The validity of the patent itself must be determined apart, and separate, from the mode or means by which the fence is made. If the fence was already known, the making of it with a new machine more rapidly, or cheaper, and better than it had been made before would not make the fence new. If it was new, and of the requisite novelty to sustain a patent, the fact that it was made by hand would not invalidate the patent. It is therefore of no importance whether the article is made by hand or by machinery. As a patentable novelty it must stand upon its own merits. The Wood Paper Patent, 23 Wall. 566–593, 23 L. Ed. 31; Cochrane v. Badische, 111 U. S. 293–311, 4 Sup. Ct. 455, 28 L. Ed. 433.

The third claim of the Bates patent is different from the first only in the "graduated order" of the strand and stay-wires; that is, arranged at different distances from each other whereby fencing is made having graduated meshes, substantially as set forth. Is such arrangement of sufficient novelty to sustain a patent? If it is, was Bates the first to design such an arrangement in the construction of wire fences? In the construction of fences to restrain animals it is a matter of common knowledge that those to restrain full grown cattle and horses are frequently not built close to the ground, while those for restraining swine, sheep, or smaller animals must be so built; and when both large and small animals are to be restrained by the same fence, it is built to the ground, with the lower strands and cross strands near together, while the upper strands are wider apart. Such an arrangement does not seem to call for the exercise of the inventive faculty, but is one that would suggest itself to any intelligent person who was about to build a fence for such purpose. Merely adjusting the distances between the posts or stays, and boards of a lumber fence built to restrain animals of different kinds and sizes surely would not be invention; and the fact that wire instead of lumber is used as material for a part of the fence would not make it so. But if it can be said to be an act of invention to arrange the strands and stays of a wire fence at different distances from each other, certainly Bates was not the first to design or construct such a fence. That style of fence is as old as the fences that are built of such material. The specifications and claims of the Coons patent of 1848 are not in the record, but a cut of

the fence covered by the patent is, and that shows the horizontal wires arranged at different distances from each other, the lower strands extending to the ground and close together, while the upper strands are farther apart, or in "graduated order" as Bates described it.

The following are cuts of the Coons and Bates fences:

COONS' PATENT (1848).

BATES' PATENT (1896).

Fig. 1

In Wire's patent of 1870 the specifications recite that the strand and stay-wires may be placed at suitable distances apart, and the lowermost wires nearer together in order to prevent hogs from getting through the fence. A cut of the fence shows it constructed in that way.

In Garst's patent of 1894, the specifications say:

"Where the fence wires are placed wide apart, the stays may be made in two or more parts having interlocking links at their joints. In this manner two short stays are used for the wires which are placed near together and may be joined and used as a single stay for wires which are twice the distance apart."

A cut of the fence shows it to be so constructed.

In the Hayes patent, applied for November 14, 1894, the cut of the fence shows the horizontal wires closer at the bottom than at the middle or upper part of the fence, and the specifications are:

"The said horizontal wires may be arranged in any number desired, or closely together, or far apart, at the option of the manufacturer, according to the height of the fence desired. * * * The vertical stay-wires consist of suitable lengths of wire that will serve to connect the line-wires vertically and hold the same rigidly spaced apart, while at the same time, * * * forming the panels of the fencing between the posts to which the line-wires are secured."

Types of fence built prior to 1896 under the Hollinger patents of 1892 and 1894 are in evidence, and show that the strand-wires are arranged in "graduated order" varying in distance of three inches and upwards from each other. The fact that wire fences were so built and used in many places in this country long prior to the Bates patent is not a matter of doubt under the evidence. Others of the patents show the strand and stay-wires arranged at different distances from each other, but those mentioned are sufficient to show that this style of wire fence was constructed many years before Bates designed his fence. In none of the patents is the "graduated order" of the wires claimed as a part of the invention or patent; but if it be invention to so arrange them, the specifications of these prior patents particularly describe such arrangement. Whether it is the coiling and intercoiling of the stay-wires around the strands, or a fence having "graduated meshes" or both, that is claimed by Bates, may be of some doubt. A liberal interpretation of the claim would be that it is for both. The graduated meshes, however, are clearly shown in prior patents and fences, and the claim for that feature cannot be sustained. This claim of the patent, therefore, if it be not lacking in patentable novelty, was fully described and clearly illustrated in prior patents, and was a feature of many fences built and used long before Bates applied for his patent.

The patent must be sustained, therefore, if at all, upon the first claim. The distinguishing feature of that claim is:

"A plurality of single graduated stay-wires arranged connecting the strand-wires together by being coiled at their end portions, about the strand-wires, and intercoiled at their meeting ends."

It is contended by defendant that the claim does not require that the stay-wires shall be in line across the strand-wires, and that their arrangement in zig-zag or staggered form would answer the requirements of the claim. This contention cannot be upheld. The language of the claim and of the specifications must be given its ordinary meaning or significance, and when the claim calls for the "intercoiling of the meeting ends of the stay-wires," that, of necessity, requires them to be substantially in line with each other. Further than this the drawings, which are a part of the patent, show the stay-wires to be in line and at right angles to the strand-wires. Continuous stay-wires in line across the fence, or of sufficient length only to span the spaces between the horizontal wires extending across the fence in line with each other and at right angles with the horizontal wires, and coiled around the strands were not new when Bates applied for his patent. Such stay-wires so arranged and coiled are shown in the patent to Coons in 1848; to Wire in 1870; to Lindley in 1888 and 1890; to Fraley in 1890; to Yates in 1891; to Hollinger in 1892; to Mooreland in 1893; to Garst and to Albright in 1894; to French in 1895; and to Hayes, patent applied for in 1894, and issued in May, 1896. Bates is conclusively presumed to have known of all of these patents, and of the style of wire fence described therein, when he designed his fence. Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 493, 494, 20 Sup. Ct. 708, 44 L. Ed. 856. He therefore invented nothing new in arranging the vertical or stay-wires in line with each other to extend across the horizontal wires, and in coiling or winding them around the outer strands of the fence.

The question remains, is the intercoil of the meeting ends of the stay-wire around the intermediate strand-wires sufficient to sustain a patent? How the intercoil is to be made is not shown by Bates, save by the drawings, and they show the meeting ends alternating with each other when wound around the strands. The winding or intercoiling of the meeting ends of vertical or stay-wires around the horizontal wires is shown in the patents to Lindley, and to Fraley in 1890; to Mooreland in 1893; to Garst and to Albright in 1894; and to Hayes, whose patent was applied for in 1894. In some of these the way in which the wind or intercoil is made is not the same as that in the Bates fence. But in two of them at least—Mooreland and Albright—it is difficult, if not impossible, to distinguish between their intercoils and that of Bates. There is testimony on behalf of defendant that Ayers & Decker of Bushnell, Ill., made at that place as early as 1876 or 1877 a three strand-wire fence with two stays spanning the spaces between the strands, coiled around the outer strands, and intercoiled around the intermediate strands, substantially as Bates coils and intercoils his stay-wires. But complainant's testimony contradicts this, and shows that the stays were arranged in staggered form only. The testimony as a whole does not show beyond reasonable doubt that a fence was built by them at that time in the manner claimed by defendant. The Barbed Wire Patent, 143 U. S. 275, 284, 12 Sup. Ct. 443, 36 L. Ed. 154. The question will therefore be determined upon the assumption that such a fence was not then built.

The following cuts show the Decker fence of 1877, and the manner in which Mooreland, Albright, and Bates intercoil the meeting ends of the stay-wires around the strand-wires in their respective fences:

DECKER'S PATENT (1877).

MOORELAND (1893).      ALBRIGHT (1894).      BATES (1896).

With these and the drawings of all the other patents before him, did Mr. Bates design anything new when he intercoiled the adjacent or meeting ends of the stay-wires around the horizontal wires of his fence? When he concluded to construct a fence with the vertical or stay-wires in line, these patents plainly indicated to him how that could be done. By cutting the cross or stay-wires in Mooreland's fence at the places indicated by Fig. 2, in the cut, and coiling the outer ends around the strands, the exact coil and intercoil illustrated by the Bates patent are shown. By loosening the coils upon the Decker fence of 1877, and moving the stay-wires together, retightening the outer coils, and intercoiling their meeting ends around the intermediate strands, the exact method of coiling and intercoiling illustrated in the Bates patent is also shown. Would the doing of any of these acts involve the exercise of the inventive faculty, or would it be anything more than would have suggested itself to any ordinary mechanic who had before him all of the patents above mentioned, and desired to construct a wire fence with the several stay-wires in line across it, and coiled and intercoiled around the strand-wires? This question is answered by the Supreme Court in Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856, upon a state of facts tending to show a patentable invention, fully as strong if not stronger than those in this case. At page 493 of 177 U. S., page 712 of 20 Sup. Ct. (44 L. Ed. 856) it is said:

"If the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use. The line between invention and mechanical skill is often an exceedingly difficult one to draw; but in view of the state of the art as heretofore shown, we cannot say that the application of this old device to a use which was only new in the particular machine to which it was applied, was anything more than would have been suggested to an intelligent mechanic, who had before him the patents to which we have called attention. While it is entirely true that the fact that this change had not occurred to any mechanic familiar with windmills is evidence of something more than mechanical skill in the person who did discover it, it is probable that no one of these was fully aware of the state of the art and the prior devices; but, as before stated, in determining the question of invention, we must presume the patentee was fully informed of everything which preceded him, whether such were the actual fact or not."

It is urged that Bates used a single plain wire for his stays, while Albright, Mooreland, and some others used two wires separately, or twisted into one, and that he therefore designed a stay-wire that would require but little more than half of the material that they required for the same purpose. But Coons, in 1848; Wire, in 1870; Decker, in 1876; Lindley, in 1888; Fraley, in 1890; Yates, in 1891; and Garst, in 1894—used a single wire for their stays. To untwist the Albright stays, and substitute for the twisted wires a single wire somewhat larger, is no more invention than to remove a part of the Mooreland stay, or to loosen the stay-wires of the Decker fence and move them together, or to dispense with one of the horizontal strands and readjust the others to make the fence the same height as before.

Section 4886 of the Revised Statutes (U. S. Comp. St. 1901, p. 3382) only authorized a patent for a device or article which was not known or used by others in this country, and not patented before the inven-

tion for which the patent is claimed, and if the alleged invention was so known, used, or patented a patent for it cannot rightly issue. Every feature of the Bates fence is conclusively shown by the evidence in this case to have been known and to have been used in substantially the same way that he describes and constructs his fence long before he applied for his patent. The conclusion, therefore, is that his patent is void, and that the bill should be dismissed at complainant's costs; and it is so ordered.