### BUONO et al. v. YANKEE MAID DRESS CORPORATION.

### SAME v. LOO–ROSE DRESS CO., Inc.
### SAME v. STRUNG et al.

#### Nos. 379–381.

Circuit Court of Appeals, Second Circuit.

May 6, 1935.

Knight Bros., of New York City (Ray T. Ernst, of New York City, of counsel), for appellants.

Mock & Blum and Asher Blum, all of New York City, for appellees.

Before· MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is the usual bill in equity for the infringement of two patents: One for a machine by which to make a kind of "blind stitch"; the other, a product patent, for the stitch itself. A "blind stitch" is one where the needle passes through several plies which are to be fastened together, but does not pass clear through the last or outside one; the stitching does not therefore show on the front, hence the name. Obviously the cloth must be thick enough to allow the needle to take up a snatch of it and still not go through. When plies of thin fabrics are sewn together, no matter how shallow the stitch, the needle will pass clear through the cloth, leaving a dot visible on the outside. Sometimes when the strains are light, the last ply need not be tacked to the others by all the stitches; some may be skipped. The outside of the garment in that case shows a dot, then a length of cloth, then a dot, and so on. The outer ply has been caught to the others only where the dots appear. It is to do this work on a "chain stitch" machine that the patented mechanism was devised. It was only an improvement upon an old machine, called the "Dearborn," which was covered by a number of patents, nearly all of which had ex-

pired before the application was filed. The Dearborn machine contained a complicated mechanism for "blind stitching" whose description without the accompanying figures would be nearly, if not altogether, incomprehensible; we shall not attempt it. It is enough to say that among its parts is a rib which pushes the fabric up into the path of the needle at the moment of the needle's traverse in an arc perpendicular to the movement of the seam. The rib runs in the line of that movement; it oscillates in an arc, retiring after the needle has made the stitch and leaving a pucker in the fabric which is retained by side members between which the rib has forced its way. The mechanism which oscillates the rib synchronously with the needle is no part of the patent and need not be described. It is enough that it did not allow for any variation in the height of the rib, by which, though the needle would enter the upper plies, it should miss the under and outer one. The Dearborn machine was for "chain-stitching," that is, for stitching with a single thread; "lock-stitching" is with two threads and requires a somewhat different machine. There were "lock-stitch" machines in which the rib—for they too had a rib—would at predetermined intervals rise to less than its full height, and then the needle pierced only the upper plies and not the lower and outer one. These sewed a skip-stitch for "lock-stitching," as the machine in suit does for "chain-stitching." Machines of this sort were, for example: Arbetter, No. 830,699 (1906); Onderdonk, No. 872,676; Mueller, No. 1,588,135 (1926). Of these Onderdonk is asserted to be applicable also to a "chain-stitch" machine, and arguendo we will so assume, for it makes no difference. In all these the skip-stitching was by a mechanism which raised and lowered the rib. So far as appears none of them found a market; but another machine did, Lewis' lock-stitcher, which also skipped stitches by varying the height to which the rib should rise. It was serviceable upon men's clothing, but it did not work satisfactorily upon women's except at the bottom of pleated skirts; and its speed was less than one-half that of the patented machine which apparently drove it out; at least it disappeared soon after that machine began to be sold in quantity.

█ The patented disclosure is of a mechanism not for varying the rise and fall of the rib, but of the "work-table" or "work-support" upon which the fabric rests. By a train of members not necessary to describe, the table, which is pivoted so as to operate like a bell-crank, is periodically oscillated, rising and falling in a period greater than the period of rotary oscillation of the rib. If the table did not move, the rib would have the same movement relative to the needle for each stitch; no stitches would be skipped. But the rib being carried by the table, shares its oscillation; its motion relative to the needle is a composite of its own unvarying reciprocal rotation, and the vertical movement of the table. This conception may not as such have demanded high ingenuity; obviously it was possible to break up the motion of the old lock-stitch rib into two components and to give one part to the table and leave the other with the rib. Again, there was nothing outstanding in carrying over from lock-stitch to chain-stitch machines the notion of skipping stitches. But the Dearborn machine was over thirty years old when the Buonos filed their application; nobody had considered it of importance to rock the table on any machine, lock or chain stitch. Much ingenuity had been devoted to that machine; there are in evidence nine Dearborn patents alone, covering a period of twenty-five years. So far as the lock-stitch art is to be regarded as relevant, it too was crowded with patents, showing many variants of rib raising mechanism. The result when it came was greatly to increase production over that of the Lewis machine, doubling it, as we have said. It does not seem to us that we can properly say that such a change was a mere routine development of skilled workmen. There had always been a substantial prize for him who could so much speed up the work and the art had not called out the winner for a generation, though many were at work on the blind-stitch machines, and skip-stitching had been a desideratum. We should indeed have no question, were it not for the high standard demanded for invention by the decisions of the Supreme Court in recent years. We cannot disregard this disposition and we must follow as faithfully as we can. Still it has not been accompanied by any change in the principles which are thought to determine invention. Indeed, in almost the last opinion of that court, Smith v. Snow, 294 U. S. 1, 14, 55 S. Ct. 279, 79 L. Ed. ——, it reiterated its approval of recourse in doubtful cases to the history of the art for the interpretation of claims. It is even more important in ascertaining the

existence of invention. "Where the method or device satisfies an old and recognized want, invention is to be inferred, rather than the exercise of mechanical skill." Paramount Publix Corp. v. American Tri-Ergon Corporation, 294 U. S. 464, 55 S. Ct. 449, 454, 79 L. Ed. ——. Hobbs v. Beach, 180 U. S. 383, 392, 393, 21 S. Ct. 409, 45 L. Ed. 586; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 429, 430, 22 S. Ct. 698, 46 L. Ed. 968; Expanded Metal Co. v. Bradford, 214 U. S. 366, 381, 29 S. Ct. 652, 53 L. Ed. 1034; Dubilier Corp. v. N. Y. Coil Co., 20 F.(2d) 723, 725 (C. C. A. 2); R. Hoe & Co. v. Goss Printing Co., 30 F. (2d) 271, 274 (C. C. A. 2); E. I. Du Pont De Nemours & Co. v. Glidden Co., 67 F. (2d) 392, 395 (C. C. A. 2). We do not understand that the court has ever abandoned that test. We agree with the judge that the patent disclosed an invention.

▉ The issue of infringement turns less upon the differences between the defendants' machine and the disclosure of the patent than upon the invalidity of claims 5 and 6 because of their form. They are quoted in the margin.* There cannot be the slightest question that if they are valid, they are infringed. The defendant has taken everything which the Buonos contributed to the art, with mechanical variations too trivial to deserve discussion. They skip stitches by tilting the table; they tilt the table by an arm which is rocked by another arm in turn rocked by a cam, the mechanical equivalent of an eccentric. The cam is mounted on a second gear driven by a first gear, which a shaft drives. The parallelism with the disclosure is not complete in detail, but that is never necessary. The only debatable matter is of the language of the claims themselves; it is the old question of how far a claim may safely be cast in terms of function. Of the elements composing claim six we may count out at once those which serve merely to identify the machine of which the patent is an improvement. This covers the phrase, "blind-stitch sewing machine comprising a stitch forming mechanism"; also the concluding element, "means for forming a bight in the material which is being stitched while it is located on said pivoted device." Both of these elements the patent took over from the prior art and the claim need not describe them further. Davis Sewing Machine Co. v. New Departure Mfg. Co., 217 F. 775, 782, 783 (C. C. A. 6). In so far as the last element means that the old stitching mechanism is to stitch the work while it is on the table, that is not expressed in terms of function. The other elements of claim 6 except a single one are in mechanical terms referable to the disclosure, and are clearly not functional. The exception is, "operating means connected to said eccentric device and turning said pivoted device at predetermined intervals." This too is readily enough identified by the disclosure, and though it does speak in terms of function that is inevitable to some degree, if the claim is to have any generality whatever. The very test of equivalency is in terms of function, "the same result by the same means"; and it is only by recourse to that standard that a patentee can pass beyond the very details of his disclosure. Some such latitude being necessary, it is only a question of how far the functional element is anchored in the disclosure, and how far it floats as a vague threat to the art. That is a question of degree, and admits of no general solution, for the mere use of the word "means" does not condemn a claim. Tokheim Oil Tank & Pump Co. v. Dean, 73 F.(2d) 32, 35, 36 (C. C. A. 7); Heidbrink v. McKesson, 290 F. 665, 668 (C. C. A. 6). In the case at bar the phrase was justified because the invention did not reside in the mechanical train connecting the eccentric with the table, but in a train which should tilt it at intervals longer than the oscillations of the rib. The details not being important, the general notion so embodied the inventors might protect. Claim 6 is valid. For the same reasons so is claim

---

* "5. A blind-stitch sewing machine comprising stitch-forming mechanism, a pivoted device adapted to support the material which is being stitched, means for forming a bight in said material while it is located on said pivoted device, a shaft, actuating means actuated by said shaft and automatically tilting said pivoted device at predetermined intervals.

"6. A blind-stitch sewing machine comprising stitch-forming mechanism, a pivoted device adapted to support the material which is being stitched, a shaft, a first gear connected to said shaft and turnable therewith, a second gear intermeshing with said first gear, an eccentric device connected to said eccentric device and turning said pivoted device at predetermined intervals, and means for forming a bight in the material which is being stitched while it is located on said pivoted device."

5, though it omits also the train between the shaft and the tilting arm. Any train would be an equivalent; the invention did not lie there.

The defendants assert that they have proved that Julius Buono had no share in the invention of the machine, and that the patent which issued to him jointly with his brother was therefore invalid. Courts have always regarded this defence with hostility; and, so far as we can see, it is totally without justification either in the statute or in any implications from the patent law at large. We agree with Robinson (section 402, note 3), that if a single inventor has mistakenly associated another with him in his application it makes no conceivable difference to the public or any one else that he is called a co-inventor and not a partial assignee, which in substance he must be. If a single person tries to patent an invention of himself and others, more may be said for the doctrine, though even then it would seem that the co-inventors might, if they chose, ratify the application and treat the patentee as trustee. Still there is unquestionably considerable authority to the contrary, though much of it is in the Patent Office or in direct appeal from it. Obviously very different considerations apply in such cases; it is proper enough procedurally, to make sure that a patent should be granted only to the real inventor, and that, if another is to have an interest in it, that interest shall appear in its true form. But we reserve assent to the doctrine (which, so far as we know the Supreme Court has never approved), that the objection is good in an infringement suit. In the case at bar we can pass the point, because the defendants are in no position to raise it, not having given notice under section 69 of title 35, U. S. Code (35 USCA § 69). The bill alleged that the Buonos "were the first, original and joint inventors of certain new and useful improvements," and this the answer denied. Had the allegation been merely that they were the "first and original inventors," section 69 would have covered the case literally. When the statute declared that the notice must be given when the defense was that "he" was not the "original and first" inventor, it referred back to the word, "plaintiff," and if there are more than one, "he" must be read "they." The addition of the word, "joint" added nothing, and was surplusage anyway; if both Buonos were the inventors, they could only be joined. The denial in the answer might be either because only one of them was the inventor, or a third person; and the statute did not mean a defendant to hold that defense in reserve as a surprise. This is the rule laid down in Walker, § 452, and Hopkins, vol. I, p. 431; and Judge Coxe, though he did not so decide, appears to have thought as much in Butler v. Bainbridge, 29 F. 142 (1886).

Another defense is that the plaintiffs put themselves out of a court of equity by their unconscionable conduct touching the patent; the doctrine of "unclean hands." This rests upon two circumstances. Before the patent issued some of their blind stitch machines were made in Germany, one at least of which was labeled, "patented," before the patent issued. Again, this machine was marked, "United States Blind Stitch Machine," and though it also carried the legend, "Made in Germany," this was so inconspicuous as perhaps not to fulfill the requirements of section 1304 (a) of title 19, U. S. Code (19 USCA § 1304 (a), and sections 106 and 123 of title 15, U. S. Code (15 USCA §§ 106, 123). As to the first objection, the plaintiffs could scarcely have had any improper intent in marking the machine, "patented." The sale was in February, 1933, and the first four claims had already been allowed since March, 1932, in exactly the form they had been originally stated. It is true that claims 5 and 6 now in suit were not allowed until the end of May, 1933, but the machine had certainly been patented in all but form. The defense, though well enough when the plaintiff has been engaged in knavery of which a decree will help secure to him the fruit, becomes a travesty when the sum of his obliquity is no more than a verbal departure from the strict truth, and his declaration is in substance the truth itself. Moreover, even if deliberate, Congress has marked this offense as venial; the maximum penalty is $100. As to the notice of importation, the objection is clearly bad in principle. The plaintiffs did not get their right to sell their machines from their patent; it was theirs of common right. Crown Die & Tool Co. v. Nye T. & M. Co., 261 U. S. 24, 34, 35, 43 S. Ct. 254, 67 L. Ed. 516. No violation of law in their sale could affect their monopoly, unlike misrepresentations touching the patent itself, which might indeed have been troublesome had they not been so innocent and so trifling. The decree as to the machine patent is affirmed.

The product patent is for the kind of stitch that the patented machine will make; that is, a chain-stitch where some of the stitches skip the face and "overlap" the turned in edge of the inner plies, and where others go through, and are beyond the edge of the inner plies. But the patent is not for the product of the machine. The parties do not appear to differ in their understanding of the law touching product patents. Conceivably it might be possible to patent a product merely as the product of a machine or process, even though it were anticipated if made in other ways. While it would in that case not be infringed by anything but the product of the machine or of the process, it might be an important protection to the inventor, if the machine or the process was used in another country and the product imported. Such competition effectively diminishes the market for the patented machine or process. That is probably not the law, though it is hard to find instances, probably because the Patent Office does not grant product patents in that form. At any rate a product patent not so limited,—and the patent in suit is not,—must be new as such, that is, regardless of the process or machine which makes it; and it must stand upon its own invention, again independently of the machine or process which makes it. Providence Rubber Co. v. Goodyear, 9 Wall. 788, 796, 19 L. Ed. 566; Cochrane v. Badische A. & S. Fabrik, 111 U. S. 293, 311, 312, 4 S. Ct. 455, 28 L. Ed. 433; American Tube Works v. Bridgwater Iron Co., 132 F. 16 (C. C. A. 1); Dunn Wire-Cut L. B. Co. v. Toronto F. C. Co., 259 F. 258, 261, 262 (C. C. A. 6); Duplate Corporation v. Triplex S. G. Co., 42 F.(2d) 739 (C. C. A. 3); One-Piece Lens Co. v. Bisight Co., 246 F. 450, 458, 459 (D. C. Md.), modified 259 F. 275 (C. C. A. 4). It would seem to follow that the invention in the case of such a product patent must lie exclusively in the conception of the product, and regardless of any method of its production, though of course the patent must disclose one way by which it can be made. While that imposes a severe standard, it is no severer than it should be, if the monopoly is to extend to the product however made. Unless conception alone is the test, and if the inventor may eke out his right by recourse to the ingenuity involved in any process or the machine, he gains an unfair advantage; for the claims cover the product produced by other machines and processes, to which by hypothesis he has contributed nothing. That result was avoided in Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 48 S. Ct. 474, 72 L. Ed. 868, and Steinfur Pat. Corp. v. William Beyer, Inc., 62 F.(2d) 238 (C. C. A. 2), on the ground that the claims were too broad; but really the difficulty is deeper. At times indeed a process may leave traces in the product and the difficulty is avoided, but that is seldom or never true of the product of a machine; and it was certainly not the case here. The stitch was not new; Julius Buono testified that his object and his brother's was to get up a machine which should imitate, so far as possible, the hand chain-stitch which skipped some stitches. The claims seek a monopoly for just that, not for a stitch made on the machine—whether or not a patent could have been secured for that—but any stitch so made, even a hand stitch. The patent is invalid.

Decree affirmed as to patent No. 1,926,-644; reversed and bill dismissed as to patent 1,926,761.