GREENE v. SOCIETE ANONYME DES MATIERES COLORANTES ET PRODUITS CHIMIQUES DE ST. DENIS.

(Circuit Court, D. Rhode Island. May 17, 1897.)

No. 2,384.

1. RESCISSION OF CONTRACTS — FALSE REPRESENTATIONS — DELAY—CHARACTER OF PROOFS.
   A contract of sale of certain merchandise to be delivered in the future was repudiated by the purchasing firm on wholly insufficient grounds, upon discovering that it would involve large pecuniary loss. Seven years later they sought to justify this repudiation on the ground that they were induced to make the contract by false representations, and thereafter sued to rescind. Held that, in view of the delay and of the apparent susceptibility to pecuniary bias, the proofs, especially when consisting of testimony of persons interested in the firm, should be most clear and convincing, both as to the making of false representations of fact, and as to the firm's reliance thereon as an inducement.

2. SAME.
   Statements of forecast, opinion, or expectation, that are in substance mere matters of inference, cannot be considered false representations, justifying the rescission of a contract.

B. N. Lapham and Herbert G. Hull, for complainant.
Edmund Wetmore and Lawrence E. Sexton, for defendant.

BROWN, District Judge. This is a bill in equity, brought by Henry L. Greene, survivor of the firm of S. H. Greene & Sons, to rescind for alleged fraud a written contract made March 12, 1883, between said firm and the defendant (for brevity called the "St. Denis Company"), a corporation incorporated under the laws of the republic of France, and to enjoin the prosecution of a suit at law begun by the St. Denis Company in this court to recover damages for the breach of said contract. By the terms of the contract, the firm

of S. H. Greene & Sons agreed to purchase from the St. Denis Company alizarine (a dyestuff manufactured from coal tar) to the amount of 1,500 kilogrammes per month, for a period of three years from October 5, 1886. This contract, the complainant contends, was procured by fraudulent representations. The state of facts existing at the making of the contract is material to the issues presented. For some years prior to October 26, 1882, alizarine was manufactured almost exclusively in Germany. A trust or combination existed among the German manufacturers to control the output and price. One of the members of this combination, the Badische Anilin & Soda Fabrik, of Manheim, Germany, represented in this country by the firm of Pickhardt & Kutroff, of New York, was the owner of letters patent of the United States which covered the alizarine product, and had been sustained by the United States circuit court for the Second circuit, as well as in other circuits (Soda Fabrik v. Cochrane, 16 Blatchf. 155, Fed. Cas. No. 719). Under these letters patent, which were not to expire until October 5, 1886, an absolute monopoly existed in this country, and the price of alizarine ranged from $1.05 to $1.20 per pound, according to brand. S. H. Greene & Sons were manufacturers of calicoes and prints, and the largest consumer of alizarine in the United States, their purchases amounting to as much as $150,000 per annum. The St. Denis Company conceived the plan of manufacturing alizarine in competition with the German combination, and, in conformity with this plan, its manager, Mr. Naville, visited this country, and opened negotiations with S. H. Greene & Sons, by a letter addressed to them, under date of October 26, 1882, which contained certain statements alleged to be fraudulent and material inducements to the contract. The material portions of said letter are as follows, the alleged false and fraudulent statements being italicized:

"I understand that you are one of the largest consumers of alizarine in this country, and presume it must be of great moment to you to be able to always secure this dyestuff as freely and as cheaply as possible. You now suffer from the monopoly on this article controlled by one house, and I don't think you will be able to help that until the end of 1886. *But you must be aware also that a combination has been made among the German manfrs. in order to monopolize this article for a long time ahead, thus substituting one monopoly for another. One of the features of this combination is the making up of a special fund for the prevention of any new manufactories.* All consumers of alizarine have therefore a great interest in breaking this combination, and promoting the creation of other houses making alizarine. Our company is willing to serve such a policy if we can get an efficient support from consumers, but we are not willing to start in competition with the German combination unless we have some kind of guaranty. We will be satisfied if consumers will bind themselves to take from us, say, a fourth of their wants during three years from the date of expiration of the patent. * * * You will remark that a contract for a fourth of your wants on three years is a small risk for you to take in comparison with the compensation you will have in our putting a check on the combination. Our price would be Frs. 6.50 p. kilo in Paris for 20%, which is a medium price between the lowest quotation before the combination and the present price of the combination. Should our competition bring the combination down to lower prices, the difference on one-fourth of your wants would be a small thing compared with the difference obtained by you through our action on the other three-fourths. I trust you will take this into consideration, and should like after that to be granted a personal interview with you."

81 F.—5

Greene & Sons replied to the above letter on November 2d, as follows:

"The subject-matter is one of importance, and should be carefully weighed. A personal interview seems essential. Our opinion now is that should you succeed in obtaining the signatures, of, say, ¾ of the largest consumers of alizarine in the country to such a compact, we would become one of the combination. We shall be glad to see you at any time."

On November 4, 1882, Greene & Sons received the following reply from the defendant, which is said also to contain fraudulent statements:

"We are in receipt of your favor of the 2d inst. No doubt, the matter is one requiring much consideration, and we agree with you that a personal interview is desirable. Mr. Naville will probably be in Boston within a few days, and, if so, will take the opportunity of calling upon you on his way. Meanwhile we would say that the suggestion of Mr. Naville that you should contract now for one-fourth or one-third of your consumption during three years from 1886 is the only way, it seems to us, by which the consumers of alizarine in this country can save themselves from *the effect of the combination of German makers which is now entered into, to continue the monopoly in the article after the present patent expires.* By contracting for a small portion of your consumption, you thereby force down the price of the balance of your wants, by enabling us to manufacture, and so break the German combination. We are quite willing to do this, but, in order to do it successfully, we must have the support of consumers. In other words, if we are assured that we have a market for a certain quantity, we are willing to make it, but without this assurance we would not care to undertake the risk."

The complainant asserts also that the defendant's agent, Mr. Naville, in a personal interview at the office of S. H. Greene & Sons, in River Point, R. I., on November 27, 1882, represented that the German combination would continue in the United States the then-existing high price after the expiration of the United States letters patent; that a special fund had been raised by the combination to prevent competition; and also made the additional statement, not referred to in the letter of the St. Denis Company, that other American consumers of alizarine, namely, Garner & Co., the Merrimack Company, and the Pacific Mills, had made contracts with the St. Denis Company similar to that prepared by Mr. Naville, and finally accepted by S. H. Greene & Sons.

The complainant alleges that, relying upon the foregoing written and oral statements, and believing them to be true, the firm signed a letter written by Mr. Naville, and addressed to the St. Denis Company, the material parts of which are as follows:

"In reply to your letter of 26th of October by Mr. E. A. Naville, and referring to personal interview with him, we have decided to accept your offer, and agree to the following: We send you two selected samples of each kind of alizarine we are using, and give you now an order, subject to you being able to match these samples, for fifteen hundred kilogrammes of 20 per cent. alizarine per month, to be delivered during three years from the date of expiration of the United States patent, at the price of francs 6.55 (six francs fifty-five centimes) per kilogramme, delivered f. o. b. Havre. We leave this order in force until the first day of April, 1883, by which time you must let us know whether you can accept the contract and match the samples."

On March 12, 1883, defendant wrote Greene & Sons that they could match the samples, and on April 17, 1883, Greene & Sons wrote the company:

"We note that you have been able to match both samples of alizarine which we sent you some time since. We are ready to carry out our contract as arranged with you when here, viz. fifteen hundred kilogrammes of 20 per cent. alizarine per month, to be delivered during three years from the date of expiration of the United States patent, at the price of six francs fifty-five centimes per kilogramme, delivered f. o. b. Havre."

About the 14th day of April, 1884, a decision was rendered by the United States supreme court in the case of Cochrane v. Soda Fabrik, 111 U. S. 293, 4 Sup. Ct. 455, to the effect that a certain process of manufacture of alizarine was not infringement of the United States letters patent, and immediately thereafter the price of alizarine fell from above $1 per pound to about 35 cents. Subsequently, the company, in letters to Greene & Sons, in July, 1884, notified them that the company would hold them to the contract. Greene & Sons, on October 11, 1884, wrote the company:

"Would say in reply that the circumstances under which the letter was written have been so radically changed by the recent decision of the United States supreme court on the alizarine patent, and upon which patent our letter was predicated, that the contract, if such it can be called, was canceled by that decision."

Afterwards, on September 23, 1886, the company notified Greene & Sons of its readiness to carry out the contract on and after October 5, 1886, the date of the expiration of the United States patent, and asked for shipping instructions. On September 27, 1886, Greene & Sons wrote, saying they did not recognize that there was any contract existing. Thereafter, and on or about May 16, 1889, the St. Denis Company brought an action at law in assumpsit against Greene & Sons in the United States circuit court, district of Rhode Island, to recover damages to the amount of $50,000 for the breach of said contract.

Before examining in detail the charges of false representation, an important fact should be noted. The contract which is the basis of the suit which this bill seeks to enjoin was definitely and distinctly repudiated by the complainant company, upon grounds having no relation to those set up in the present bill. About April 14, 1884, a decision rendered by the supreme court of the United States (Cochrane v. Soda Fabrik, 111 U. S. 293, 4 Sup. Ct. 455) practically destroyed the monopoly; and on October 11, 1884, Greene & Sons repudiated the contract, upon grounds indefensible in law, namely, as before stated, on account of the radical change of circumstances caused by the decision of the supreme court. Not until the St. Denis Company, on May 16, 1889, after the expiration of the contract period, brought suit for breach of contract, was the claim made by S. H. Greene & Sons that the contract had been procured by false and fraudulent statements. This position was first taken, so far as appears of record, by pleas filed in the action at law, and dated November 28, 1891. The bill therefore asks that the contract be annulled for reasons first advanced more than eight years after its making and more than seven years after its repudiation. The complainant excuses this delay by testifying that the falsity of the statements was first discovered in 1891. This excuse is hardly satisfactory in view of his testimony (afterwards corrected) that knowl-

edge that contracts had not been made with other parties was one of his grounds for repudiating the contract in 1884. But, conceding the claim that actual knowledge was not received until 1891, it yet appears that there was an unwarranted and persistent refusal to recognize the demands of the St. Denis Company for many years, during which the firm of S. H. Greene & Sons had full opportunity to become informed of their legal obligations and of the binding char-·acter of the agreement into which they had entered. This conduct, apparently having no other basis than an unwillingness to accept a pecuniary loss, affords so strong evidence of susceptibility to the bias of pecuniary interest that all evidence on behalf of the complainant as to the exact expressions used by the manager of the St. Denis Company in a personal interview 11 years before the taking of testimony, and all evidence as to the materiality and inducing quality of any statements, must be regarded as given under a like bias. It is difficult to believe, in the face of a well-proven predetermination to repudiate a contract without reasons, that when reasons are tardily given, and when the alternative is either to acknowledge error or to furnish new grounds of justification for previous action, there will be satisfactory accuracy in describing personal motives and oral expressions. When an act is done for one reason, and defended upon another, we are justified in requiring the most satisfactory proof of the facts which are the basis of the new reason. Therefore, in determining the questions of whether the statements were such as were acted upon, and whether they were material inducements to the contract, we must be guided by our views of probability, rather than by the statements, however positive in form, of witnesses exposed to the influence of such bias. Nor can we, in determining whether a statement was made by Mr. Naville, the St. Denis Company's agent, as a matter of opinion or as a matter of fact, attach importance to the reiterations of witnesses that certain things were represented as matters of fact, and not as matters of opinion.

The foregoing considerations render it proper, before considering the meaning and accuracy of the statements made in writing, to dispose of the question which rests, not upon documentary evidence, but upon testimony as to an oral interview. We inquire, therefore: Did the defendant's agent, Naville, in an oral interview on November 27, 1882, falsely and fraudulently represent and state to Greene & Sons that the firm of Garner & Co., the Merrimack Company, and the Pacific Mills, or any of them, had made contracts with the defendant similar to that proposed to and finally made with Greene & Sons? It should be observed that the contract finally entered into was a simple contract for the sale, delivery, and acceptance of a certain quantity of alizarine at a certain price. It contains no reference to the making of other contracts, and upon its face the contract is independent of the condition that other like contracts had been or should be made. The testimony of Henry L. Greene, given 11 years after the interview, professes to give only its general purport. It appears from this testimony that Naville expressed the desire and intention of the company to come into the market provided that it

could get encouragement from consumers in America, and stated that the defendant was to erect works provided it could make contracts enough. H. L. Greene expressly states that Naville informed the firm that he was in negotiation with the persons named, and also that Naville stated that he had made contracts with two out of the four, though not disclosing the names, and also says, "We were left to infer that it was two of the four." The testimony of this witness is not clear, nor are his statements entirely consistent with each other, nor with the account of the transaction given by Robert Reoch, the only other witness for complainant as to the transaction. Without attributing to the complainant intentional perversion of fact, it is yet manifest, upon reading his whole testimony, that his actual recollection of the interview is exceeding indistinct. In his narration he obviously has the importance, in this litigation, of the distinction between statements of fact and statements of opinion, much more clearly in mind than the actual language or even the general import of the conversation. In view of the bias of interest, of a previously expressed intention of repudiating the contract for other reasons, and of the lapse of time, his testimony falls far short of the requirement that proof of fraud should be clear and convincing. His testimony, moreover, entirely fails to substantiate the allegation of the bill that it was stated to the firm "that contracts had been made with Garner & Co., the Merrimack Company, and the Pacific Mills." Upon the whole, the testimony of this witness, as opposed to that of the defendant, may be disregarded, save as to the contradiction it gives to the witness Reoch. The testimony of Reoch, who is pecuniarily interested in the firm, and whose testimony must be regarded as subject to the same bias, is more explicit. The testimony was taken after that of Greene, and when the unsatisfactory nature of Greene's testimony was probably apparent. He supports the allegation of the bill that an express statement was made that the concerns named in the bill had made contracts. But, in view of all the circumstances, his testimony, as against the denial of Naville, and considering his disagreement with Greene, fails to establish the making of the statements.

It is urged that complainant's letter of November 2, 1882, supports the view that the obtaining of the other contracts was a material inducement. The language is: "Our opinion now is that should you succeed in obtaining the signatures of, say, $\frac{3}{4}$ of the largest consumers of alizarine in the country to such a compact, we would be one of the combination." It is probably true that, at the time of writing, there was in contemplation of S. H. Greene & Sons a compact or combination. But the idea of making such a combination was abandoned at the time of making the contract. The entire responsibility for carrying on the work was assumed by the St. Denis Company, and, in the face of the contract, the evidence is not satisfactory that the making of other contracts was relied upon as an inducement. There appears no reason for holding it more probable that S. H. Greene & Sons desired a combination for their own purposes than that they were satisfied to make an individual contract, as they in fact did. Even were the statement made, it is

far from clear that it was a material statement. The question of the materiality of the statement, however, is removed by the finding that the statement is not proved to have been made.

Eliminating this branch of the case, we proceed to the representations made in writing:

"But you must be aware also that a combination has been made among the German manfrs. in order to monopolize this article for a long time ahead, thus substituting one monopoly for another. One of the features of this combination is the making up of a special fund for the prevention of any new manufactories. * * * The combination of German makers which is now entered into, to continue the monopoly in the article after the present patent expires."

These representations must be considered in view of the fact well known to Greene & Sons that a powerful German combination existed. Counsel for the complainant contend that the representations were made for the purpose of creating in the minds of S. H. Greene & Sons the belief that a then-existing agreement provided in express terms for the continuance of the monopoly after the expiration of the United States patent. It is then claimed that the untruthfulness of the statements appears from the deposition of the controlling officer of the German syndicate, as well as from the written agreement of the syndicate, showing that no express provision relating to the maintenance of prices in America after the expiration of the United States patent was contained in the written agreement, and that the syndicate agreement therefore did not provide for the substitution of one monopoly for another; and also that the written agreement contained no express provision for a special fund for the prevention of any new manufactories, and that in fact no such special fund had been raised. This contention is not supported by a reasonable or fair interpretation of the language of the written statements alleged to be fraudulent. I am of the opinion, upon all the evidence, that the parties were contracting, not upon the basis of a supposed knowledge of the terms of the syndicate agreement, nor even of its perfected plans, but merely in anticipation of the probable sequence of a present business condition, and that the contract was entered into upon the basis of facts known to both parties, and practically undisputed.

By reference to the syndicate agreement dated September 27, 1881, the general purpose of the syndicate is found to be thus expressed: "The contracting parties agree and engage themselves to fix the quantity of alizarine (alizarine red) to be sold," etc. The quantity is fixed, subject to increase or decrease by further agreement, with the exception of the United States of America, and the provision appears: "The consumption in the United States is supplied without control by the Badische Anilin Soda Fabrik." The main and substantial fact was the existence of a powerful combination. The purpose of the contract between the St. Denis Company and S. H. Greene & Sons was to provide against the control of that combination over prices in the United States after the expiration of the letters patent, viz. October 5, 1886. In making such provision, did the firm of S. H. Greene & Sons proceed upon the belief that the written terms of a completed contract of the German syndicate pro-

vided for a control of American prices after October 5, 1886, and for a special fund for the prevention of competition; or did they proceed in reliance upon their own judgment that an existing combination was so likely to take future action to control the market of the United States that it was sound business judgment to anticipate and provide for such action? Neither the writings in evidence nor the testimony of Greene or Reoch afford support for the former contention. The existence of a written contract controlling the syndicate's action was not mentioned or discussed. The existence of a belief or supposition of the parties that on November 27, 1882, the business policy of the German syndicate for a period beginning nearly four years after, on October 5, 1886, was so definitely fixed as to afford Greene & Sons an actual basis of fact for their judgment as to the advisability of making the contract, is neither proved nor probable. If the provisions of a completed contract of the syndicate were material, it is highly improbable that men of large business experience, themselves the largest American consumers of alizarine, of which their purchases at the time amounted to $150,000 per annum, would have based their action upon the mere statement of a comparative stranger as to the terms of the syndicate agreement, and upon such indefinite statements as are testified to in the case.

It is apparent, not only from the character of the combination, but from the terms of the syndicate agreement, that its purpose was to monopolize the article for a long time ahead, and that the statement was substantially true. It is only by the unwarranted assumption that the language referred, not to the broad purpose of the combination, but to a special written or perfected agreement, that the complainant is able to argue the existence of any discrepancy between the existing facts and the statement of the St. Denis Company. I am of the opinion that, as urged by defendant's counsel, the statements were of matters of opinion and forecast; that they related to the purpose and intention of the German manufacturers, which could not have been stated by Naville as anything else than a matter of inference, because he could not assert as a matter of fact what could be only positively known by entering the minds of the persons composing the association. It is by no means fair to assume that the parties understood that the syndicate agreement embraced the full scope of the purposes and intention of the members, or that it was a fixed and controlling agreement, and not subject to whatever enlargement or modification the business situation might well call for during the years before the expiration of the letters patent; and it was fair and natural to assume the continuance of the combination so long as it should be profitable. Practically, all that Naville said was that the expiration of the American patent would not break up the trust, and that the trust would control the market in America. It is familiar law that statements of forecast, opinion, or expectation, that are in substance merely matters of inference, cannot be made the subject of a false representation. Gordon v. Butler, 105 U. S. 553; Sawyer v. Prickett, 19 Wall. 146; Reeves v. Corning, 51 Fed. 774.

There remains to consider specially the statement: "One of the features of this combination is the making up of a special fund for the prevention of any new manufactories." I think that little importance can be attached to the word "special" in the foregoing statement. The material part of the allegation was that money was to be provided for preventing competition. If there was money for that special purpose, it is trivial and immaterial to inquire whether it was treated, for purposes of banking or of bookkeeping, as special or otherwise. It is sufficiently proved that various matters involving expense, that may be described, in the language of the syndicate minutes, as "protective measures against new competition," were provided for; that proportional contributions were made for the purchase of a factory for the prevention of competition; and that provision was made by the terms of the syndicate agreement for a proportional contribution for the expense of the control office, and for all expenses caused by the association, which included expenses in carrying out what was one of the main purposes of the combination, —the prevention of competition. It is provided in express terms:

"The amount of the working fund for the control office will be fixed by the president. The contracting parties share in this according to their participation, as fixed in section 1, and have to pay the share in cash to the control within ten days after they get notice to do so."

Employing the language of the brief of the learned counsel for the St. Denis Company, and agreeing with its statement of fact:

"The combination did have such a fund. It was maintained by regular assessments. They did expend it, whenever necessary, in attempts to suppress competition; and to assert that there is any material variation between the general statement that there was a special fund, small or great, available for the purpose named, and the fund actually available and ready and intended to be used for that purpose, is too manifestly unreasonable for serious discussion."

Upon the findings, therefore, that the statements that other contracts had been made is not proved to have been made by Mr. Naville, and that there was no misrepresentation in the written statements or in the oral statements of Mr. Naville relating to these matters, and no material discrepancy between the statements and the facts, I am of the opinion that there is no ground for attributing to the defendant corporation or its agent either bad faith or inaccuracy or recklessness of statement, and that, on the contrary, their good faith and substantial accuracy of statement in the dealings resulting in the contract are satisfactorily established. The injunction is therefore denied, and the bill will be dismissed, with costs.