**CONTINENTAL OIL COMPANY,**
Plaintiff-Appellee,

v.

**WITCO CHEMICAL CORPORATION,**
Defendant-Appellant.

No. 72–1045.

United States Court of Appeals,
Seventh Circuit.

Argued April 2, 1973.

Decided Aug. 24, 1973.

As Amended on Denial of Rehearing
Oct. 4, 1973.

Sidney Wallenstein, Chicago, Ill., Jordan J. Driks, New York City, for defendant-appellant.

William A. Marshall, Charles J. Merriam, Chicago, Ill., for plaintiff-appellee.

Before CLARK, Associate Justice*, and FAIRCHILD and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Alkyl benzene sulfonate ("ABS"), the detergent most widely used in the 1950's, created severe pollution problems because it resisted biodegradation. It was known that structural "branching" in one part of the ABS molecule, the alkyl substituent, was the source of the problem, and that an increase in the incidence of "straight chain" or "linear" alkyl substituents would improve biodegradability. The problem was (a) to start with a linear, rather than non-linear, source material for the alkyl substituent, and (b) to minimize or avoid loss of linearity during manufacture. The total elimination of non-linear alkyl substituents from the finished product was not expected and is still considered an economic impossibility. Continental's research chemists claim to have discovered that if non-linearity was eliminated in about 90% of the product, it would be "substantially completely biodegradable." The Patent Office rejected plaintiff's process claims, but allowed product claims which defined the patented subject matter by describing its method of manufacture.[1] The district court,

---

* The Honorable Tom C. Clark, Associate Justice of the Supreme Court of the United States, retired, is sitting by designation.

1. Patent No. 3,316,294 issued April 25, 1967, to Continental Oil Company, as assignee of Feighner and Kapur, pursuant to Application No. 466,847 filed June 24, 1965, column 2, line 10.

without appraising the differences between the claims and the prior art, held the patent valid and infringed. We reverse.

I.

The essential facts are not in dispute. For the most part, they are recited in the patent specifications, in unchallenged findings,[2] in a glossary[3] and historical statement[4] on which both parties rely, and in uncontradicted testimony.

The patent covers two products, a "detergent alkylate" and its "sulfonate derivative"; these products are defined by describing the process by which they are made. .

The process includes four stages: (1) segregating or *obtaining a supply* of "normal paraffins" (*i. e.*, a species of linear or straight chain hydrocarbons) from a suitable petroleum source, such as kerosene; (2) partial *chlorination*—between about $\frac{1}{10}$ and $\frac{1}{3}$ (preferably 20 mole percent)—of the normal paraffins yielding a mixture of unreacted linear paraffins and chlorinated paraffins; about 90% of the chlorinated portion are "monochlorinated" (which is desirable) and about 10% are di-, tri-, and polychlorinated (undesirable); (3) *alkylating* benzene (or another aryl compound) with the chlorinated paraffins in the presence of a catalyst and distilling the resulting mixture to remove unreacted benzene, normal paraffins (which can be recycled) and certain impurities, thereby yielding the "detergent alkylate" described in Claims 1 and 3 of the

patent;[5] and (4) *sulfonation* of the alkylate to produce a surfactant, the product described in Claim 2 of the patent.[6] That product is described commercially as a "soft detergent," or as LAS (linear alkyl benzene sulfonate) (even though it is only about 90% linear), in contradistinction to ABS (alkyl benzene sulfonate), which is known as a "hard detergent" because it is "hard" to biodegrade.

The patent issued in 1967 on an application filed in 1965, as a continuation of a parent application filed on August 4, 1961.[7] The inventors were research chemists employed by the plaintiff. The problem which confronted their employer and other detergent manufacturers, and which their invention was intended to solve, was well described in their specifications:

"Throughout about the past two decades, synthetic detergents have been increasingly displacing the traditional soaps in domestic cleaning applications in the United States. At the present time, it is estimated that about 75 percent of the combined sales of household cleansing surfactants are of the synthetic detergent type.

"The household synthetic detergents presently used embrace a number of different products; however, the bulk of these detergents are of the alkyl benezene sulfonate type generally referred to as ABS. This type of detergent is made by alkylating benzene with a comparatively highly branched $C_{12}$ and/or $C_{15}$ olefin and then sulfo-

2. Especially Findings 10 through 37, A. 24–35.

3. DX–52, A. 1924.

4. DX–53, A. 1943.

5. "1. A detergent alkylate obtained by the aluminum chloride catalyzed alkylation of an aryl compound selected from the group consisting of benzene, a lower alkyl substituted benzene and mixtures thereof with a chlorination product prepared by partially chlorinating a petroleum derived hydrocarbon fraction consisting essentially of $C_{10}$ to $C_{18}$ straight chain paraffins to the extent whereby

from about 10 to 35 mole percent of the paraffins are chlorinated, said fraction further characterized as comprising a predominant amount of component paraffins of 11 to 15 carbon atoms.

\* \* \* \* \*

"3. A detergent alkylate in accordance with claim 1 wherein said aryl compound is benzene."

6. "2. A biodegradable water-soluble surfactant comprising the alkali metal sulfonate salt of the detergent alkylate of claim 1."

7. Serial No. 129,252. See note 1, *supra.*

nating the resultant alkylation product. While these materials are excellent cleansing agents, their use has posed a considerable problem. The specific problem involved is that the ABS detergents are not readily removed or decomposed in sewage treatment plants. These detergents will remain throughout the treatment step as such without being significantly decomposed by the bacteria present. This resistance to decomposition is not due to the lack of suitable strains of bacterial [sic] within the sewage effluent nor to the length of time that can be allotted for treatment, but is fundamentally due to the chemical structure of the surfactant which resolutely resists metabolic attack by any kind of bacteria. One of the adverse effects of the presence of ABS in sewage effluents is that voluminus [sic] foams are caused to be formed which result in difficult and hazardous working conditions at the disposal plants. Also, the persistent foam formed constitutes a health hazard since the bacteria contained in the foam is often as high as 20 times that contained within the liquid phase.

"In addition to causing foam problems in the sewage plants, the presence of non-decomposable ABS in sewage effluents, including septic tanks effluents, has already resulted in considerable contamination of the available drinking water supply in populous areas. While it is generally believed that the ABS-type surfactant is not toxic to man, a currently considered proposal for revising the Public Health Service Drinking Water Standards to include a limit on the amount of ABS in potable water most significantly foreshadows the necessity for detergent manufacturers to produce a soft type of detergent, that is, one which is completely and readily biodegraded.

"It is accordingly the primary object of this invention to provide detergent alkylate compositions, which upon sulfonation give effective detergent agents which at the same time are *substantially completely biodegradable.*" [8] (emphasis added).

The specifications then recite the fact that bacteriologists have noted that the branched configuration of the alkyl substituent in conventional ABS detergents impeded satisfactory biodegradation, and concurrently that detergents containing straight-chain or linear alkyl substituents were subject to complete biodegradation. The inventors' mission was to find an economical, feasible method of producing a detergent which was "substantially completely biodegradable."

As we understand the record, the four-stage process they developed differed from the conventional method of making hard detergents in the first and second stages, but was essentially the same in the third (alkylation) [9] and fourth stages.[10] The first step was different because the selected source material contained straight chained paraffins instead of branched hydrocarbons. Plaintiff does not claim to have discovered or improved the method of segregating or obtaining the first stage material.[11]

8. Patent No. 3,316,294, column 1, line 35 —column 2, line 10.

9. In the description of alkylation, the patent specifications state: "The alkylation step contemplated herein essentially corresponds to the prior art method of alkylating benzene to produce ABS detergents except for the presence of large amounts of n-paraffins in the alkylation reaction." Column 6, lines 53–56.

10. The specifications state: "The sulfonation of the detergent alkylate prepared generally in accordance with the above can be carried out by any one of a number of conventional methods using as the sulfonating agent either oleum, $SO_3$, mixtures of $SO_3$ and $SO_2$ or chlorosulfonic acid" Column 7, lines 58–62.

11. An intracompany memorandum dated April 12, 1960, implies that recent developments by others had made such material obtainable on an economic basis for the first time. A. 1729. Defendant relies heavily on the inference that the

The second stage involved a significant change from the chlorination step in the production of hard detergents. It substituted partial chlorination (between 10 and 35 mole percent) for 100 mole percent chlorination of the hydrocarbon source material. The purpose of this change was to maximize the quantity of monochlorides and minimize the quantity of di-, tri- and polychlorides in the second stage product. The monochlorides were desirable because they would not cause isomerization of the paraffins in the alkylation step, whereas the polychlorides were more likely to isomerize.[12] Thus, a relatively low quantity of monochlorides (and a correspondingly high quantity of polychlorides) would tend to destroy the linear characteristics which was needed to assure acceptable biodegradability.

Although the third stage alkylation step is admittedly old, plaintiff contends that the aluminum chloride catalyst was proved economically feasible in a manner not obvious under the prior art.[13] It had been assumed that unless the unchlorinated paraffins, which constituted from 65 to 90% of the stage-two product, were removed by distillation prior to alkylation, they would be isomerized and therefore could not be recycled. The hydrocarbons and other impurities such as unreacted benzene are normally removed by distillation after alkylation. The fact that they did not isomerize during alky-

lation was, according to plaintiff, an unexpected discovery which makes it possible to recycle the unchlorinated linear paraffins without incurring the cost of removing them prior to alkylation of the chlorinated paraffins.

As with the first stage, plaintiff makes no claim of invention in the fourth stage (sulfonation). Indeed, Continental expressly states that "Each of the steps by itself was old." Brief for Appellee at 10.

Plaintiff's primary contention is that the "combination produced a new product with surprising and unpredictable properties." These properties relate to the effectiveness of the product. Continental claims it was not obvious that the product of the suit patent, which is 85-95 percent pure LAS, would biodegrade satisfactorily because hypothetical persons with ordinary skill in the art would have realized that the partial chlorination would produce at least 10% di-, tri- and polychlorides, which in turn would cause a non-linear configuration in a portion of the alkyl radicals in the alkylate. The ultimate fact that this amount of non-linearity would not defeat commercial success, plaintiff argues, was not obvious.

Defendant admits infringement. Its only defense is that the invention was obvious. In support of this position it points out that plaintiff's own executives concluded that the product "has no

---

availability of inexpensive straight-chained paraffins is what triggered plaintiff's new product development. The district court did not so find and we are not persuaded that the April 12, 1960, memorandum compelled any such finding. The problem described in the patent specifications, as quoted above in the text, adequately explains the motivation for plaintiff's research.

12. Plaintiff's expert testified: "Monochloro—linear paraffins should give alkyl benzenes. The dichlorides and polychlorides should yield non-linear alkyl benzenes." A. 73.

13. "The alkylating stock is the chlorination product described in the preceding

section, and consequently, as such, contains a high percentage of unhalogenated or pure hydrocarbons. In using such a mixture as an alkylating agent it was found, contrary to expectations, that the excess normal paraffins were not isomerized during the alkylation of the aryl compound. As mentioned, it is preferred to use a strong alkylating catalyst such as aluminum chloride which is a known catalyst for the isomerizing normal paraffins to isoparaffins. Consequently this unexpected finding makes the instant process commercially feasible insofar as the normal paraffins present in the alkylation stock can be recovered and reused to prepare additional chlorinated mixtures for use as the alkylating agent." Column 6, lines 61–75.

unique or patentable features"; [14] that promptly after the inventors were assigned their mission they made the correct theoretical calculations with respect to the partial chlorination stage and achieved success on their first experimental partial chlorination as well as their first experimental alkylation; [15] and that competing manufacturers developed the same product in response to the same market stimuli, apparently without any assistance from plaintiff's work. These arguments tend to establish obviousness, but, in our opinion, are not in themselves sufficient to overcome the findings and conclusions of the district court or the presumption of validity.

■ We are, nevertheless, convinced that the subject matter of the allowed claims was obvious notwithstanding the unanticipated features stressed by plaintiff.

## II.

■ The defense of obviousness raises a question of law. Armour & Co. v. Wilson & Co., 274 F.2d 143, 151–157 (7th Cir. 1960). The statute, 35 U.S.C. § 103, provides that a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made . . . ." It is, therefore, imperative that the *differences* between the new product, as a whole, and the

prior art be identified and evaluated as of the date of the invention. As Mr. Justice Clark plainly stated in his opinion for the Court in Graham v. John Deere Co.:

> "Under § 103, the scope and content of the prior art are to be determined; *differences* between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed. 2d 545 (emphasis added).[16]

In this case, the findings of the district court describe the prior art in great detail, but omit any specific reference to the differences between the claims and the prior art. Since the findings contain no express delineation of such differences, they cannot shed any light on the trial court's evaluation of the difference or differences it regarded as sufficiently critical to demonstrate that the subject matter as a whole was not obvious before October, 1960, when the invention was complete.[17] Without such delineation and evaluation of differences, the district court's findings of fact do not adequately support its ultimate conclusion of patent validity. We must, therefore, evaluate these differences and their significance.

## III.

The parties take issue on three allegedly novel elements of the invention. Those elements are (1) the selection of

14. In a report written on November 8, 1961, the inventors' supervisor in plaintiff's research department stated:
    "Since last spring numerous articles have been published indicating that there is a general awareness of the biodegradability problem, and that our competitors and potential competitors are actively developing biodegradable detergents. Our customers have indicated a willingness to purchase a biodegradable product when it is available and have been supplied samples of such products by our competitors. We feel that the process we have chosen to develop will produce a good product competitively; however, it has no unique or patentable features and the only possible

advantage we can hope for is to be first or early in the market." A. 1804.

15. A. 147–149. These initial experiments were performed, respectively, on July 18 and July 22, 1960, and resulted in the product described in claims 1 and 3 of the patent. There is no question about the fact that the development of the finished surfactant from the third stage product (the detergent alkylate) by means of sulfonation was obvious.

16. One section of the Graham opinion explicitly analyzes "The Obviousness of the Differences." 383 U.S. at 24–26, 86 S. Ct. 684.

17. See A. 1333.

the 10–35 mole percent chlorination range in order to maximize the production of monochlorides; (2) the fact that alkylation may be catalyzed by aluminum chloride without causing isomerization of the excess, unchlorinated linear paraffins; and (3) the unanticipated and remarkable success of the product in affording a solution to the foam problem.

Plaintiff properly emphasizes the importance of partial chlorination but implicitly acknowledges that the consequences of partial chlorination, as described in the patent, were predictable.[18] Indeed, process claims encompassing partial chlorination were rejected by the Patent Office as obvious under the prior art.[19] If the inventors' objective is assumed to have been the production of an 85–95% pure LAS detergent,[20] the use of this established process as one step in the product's manufacture would therefore have been obvious to one skilled in the prior art. But there is an even more basic reason why this step in the process does not make the end product patentable. Even if we were to assume that this step was new—or indeed that the entire process was not only new but patentable as well—that assumption would not demonstrate that the product was new or nonobvious. For an old product made by a new process is not patentable; the product must be patentable in its own right.[21] Therefore, the

18. The prior art unequivocally establishes (1) that if the paraffins were partially, instead of totally, chlorinated, the chlorinated product would contain a higher proportion of monochlorides; and (2) that the ratio between monochlorides and polychlorides was a calculable function of the extent of partial chlorination (A. 332) —thus the preferred 20 mole percent would produce about 90% monochlorides and 10% undesirable chlorides. The range between 10% (which produces 95% monochlorides) and 35% (which produces about 85% monochlorides) (see A. 1515) was acceptable. Although 10 mole percent chlorination apparently yields better chemical results than 20 mole percent, it is not the preferred percentage for the economic reason that it requires excessive recycling of the unchlorinated paraffins. Plaintiff affirmatively proved that the presence of dichlorides and polychlorides in the chlorinated paraffin would tend to yield a non-linear product (see note 14; see also testimony of the defendant's expert at A. 336–337, 342–343. Presumably this fact was not significant in the production of ABS since the first stage material was already branched.) We find no argument by plaintiff to the effect that this propensity was unknown before the invention; on the contrary, plaintiff argues that the hypothetical person familiar with the art would have inferred from the fact that this quantity of undesirable chlorides was present in the second stage product, that the end product would not be sufficienly biodegradable to solve completely the problem of foaming in sewage treatment plants. Brief for Appellee at 22, 24, 35–36, 38 n. 25, 39.

19. Before the Patent Office plaintiff apparently contended that the use of partial chlorination in order to improve the ratio between monochlorides and polychlorides was not described in the prior art except in the Kyrides reference (Patent No. 2,161,174 dated June 6, 1939) which plaintiff argued, Kyrides himself had later concluded was not as desirable as initially envisioned (A. 1302), but non-cited references (particularly Tramm U. S. Patent No. 2,683,688 issued July 13, 1954) disclosed the use of partial chlorination to obtain a higher yield of monochlorides. A. 1515.

20. Any contention that the use of partial chlorination was not obvious because one skilled in the prior art would not think than an 85–95% pure LAS product would solve the foaming problem is merely a restatement of the third alleged novelty of the product, i. e., that the extent of the product's success was unanticipated.

21. "A machine may be new, and the product or manufacture proceeding from it may be old. In that case the former would be patentable and the latter not. The machine may be substantially old and the product new. In that event the latter, and not the former, would be patentable. Both may be new, or both may be old. In the former case, both would be patentable; in the latter neither. The same remarks apply to processes and their results. Patentability may exist as to either, neither, or both, according to the fact of novelty, or the opposite. The patentability, or the issuing of a patent as to one, in nowise affects the rights of the inventor or discoverer in respect to the

claim that the partial chlorination step was novel does not establish the patentability of plaintiff's product.

For comparable reasons the discovery that aluminum chloride will not cause isomerization of the unchlorinated paraffins does not establish the nonobviousness of plaintiff's product.

The argument that his discovery was unforeseeable relies heavily on the finding that aluminum chloride "was known to function as a catalyst for isomerization of hydrocarbon materials." (Finding 41, A. 44.) Since the term "hydrocarbon materials" encompasses an almost unlimited number of substances, that finding by no means indicates that a person with ordinary skill in the art would expect aluminum chloride to cause isomerization of linear paraffins.[22] At most, we think the finding indicates that the consequences of using aluminum chloride as the catalyst were somewhat doubtful until after an experiment had been made. Since aluminum chloride had been so widely used as a catalyst in the production of ABS, at the very least it was obvious to experiment with this catalyst.[23]

Again, however, even if the discovery that aluminum chloride was an acceptable catalyst to use in the manufacture of LAS was nonobvious, that discovery related to the process rather than the character of the product. As a catalyst aluminum chloride simply promotes the alkylation reaction; it does not affect the qualities of the end product.[24] The value of that discovery relates only to the fact that anticipated costs associated with the recycling of unchlorinated paraffins did not materialize.[25] It seems to us that a discovery that certain procedures will result in a reduction of manufacturing costs cannot adequately support a product claim unless that discovery entitles the inventor to a valid claim on the process.[26] If a product patent is to rest solely on the novelty of the processes by which it is made, then those

other. They are wholly disconnected and independent facts." Rubber Company v. Goodyear, 9 Wall. 788, 76 U.S. 788, 796, 19 L.Ed. 566.

22. Appellant disputes this finding by reference to Feighner's own U. S. Patent 2,914,580, which "shows the production of alkyl benzenes by a reaction in which benzene is reacted with a *linear* paraffin (normal hexadecane) in the presence of aluminum chloride to form hexadecyl benzene (Example 1 of said patent) and there is not even a murmur of any isomerization. . . ." Brief for Appellant at 46.

23. "We put this patent down as one of those step by step advances, not beyond the compass of capable investigators who run down every lead, and cull out those which appear advantageous. It might be desirable to promote such activities by limited monopolies, but that is not the law; patents do not go to patient and exhaustive experiment; they are the reward of exceptional talent." Hazeltine Corp. v. Abrams, 79 F.2d 329, 332 (2d Cir. 1935) (L. Hand, J.).

24. "A catalyst is a compound which promotes or enhances the rate of a chemical reaction, but is not itself consumed in the process." Finding No. 28, A. 31.

25. Although the district court's finding refers to the teaching that aluminum chloride might function as a catalyst for the isomerization of "hydrocarbon materials," in its brief plaintiff merely contends that there was concern about isomerization of the unchlorinated linear paraffins. See appellee's brief, page 38 n. 24. See also column 6, lines 64–75, of the suit patent. Plaintiff has not explained why the catalyst would isomerize the unchlorinated linear paraffins without at the same time causing isomerization of the chlorinated paraffins as they react with the benzene during alkylation. Such an effect would, of course, destroy the crucial property of the product. That aluminum chloride as a catalyst would *not alter the end product was taught by* British Patent 681,211, see column 3, lines 20–24. The British patent differs from the suit patent in that the polychlorides and the unchlorinated paraffins are removed by distillation prior to alkylation.

26. Plaintiff's contention that the product was not obvious because it was not known *that it could be made by this particular* process does not, in our opinion, effect the necessary metamorphosis.

processes must be patentable.[27] In this case, since the Patent Office has determined that those processes are not patentable, we believe the product must be patentable in its own right.[28]

This brings us to the crucial issue—the obviousness of the product itself. In 1960, when the invention was made, it was perfectly obvious that a detergent containing 85–95% pure LAS would be considerably more biodegradable than the ABS, the hard detergent then on the market. Nevertheless, plaintiff contends that it was not predictable that the product would completely solve the foam problem, which it did. We believe that success was sufficiently obvious to bar patentability.

Plaintiff contends, and the district court found, that a detergent must biodegrade 90% in four to six hours in order to alleviate the foaming problem. Finding No. 8, A. 24. A detergent need not be fully decomposed because small amounts (less than .5 part per million parts of sewage) can be tolerated. The prior art taught that detergent molecules with linear alkyl substituents biodegraded promptly and presented no problem. Continental's patent claims a product which is 85–95% pure LAS.[29] Since only 90% biodegradation was required, it was certainly obvious that the purest form of the product claimed (at least in the 90–95% range) would succeed. The LAS portion was expected to biodegrade; moreover, the remainder would also biodegrade to some extent.[30] Clearly, most of the product range claimed by plaintiff could fairly be expected either to solve the foam problem completely or at least to be "substantially completely biodegradable."

Plaintiff argues, however, that it made the nonobvious discovery that certain impurities known as alkyl tetralins would readily biodegrade, making the product even better than expected.[31] The patent itself does not disclose this discovery. Nor does Continental argue that this feature was of critical importance in solving the foam problem.[32] In-

27. There is even some doubt as to the validity of such a product claim:

"Conceivably it might be possible to patent a product merely as the product of a machine or process, even though it were anticipated if made in other ways . . . . That is probably not the law, though it is hard to find instances, probably because the Patent Office does not grant product patents in that form." Buono v. Yankee Maid Dress Corp., 77 F.2d 274, 279 (2d Cir. 1935) (L. Hand, J.).

28. At any rate a product patent not [limited to a patentable process] must be new as such, that is, regardless of the process or machine which makes it . . . . It would seem to follow that the invention in the case of such a product patent must lie exclusively in the conception of the product, and regardless of any method of its production, though of course the patent must disclose one way by which it can be made." Buono v. Yankee Maid Dress Corp., 77 F.2d 274, 279 (2d Cir. 1935) (L. Hand, J.).

In Ideal Roller & Mfg. Co. v. Sutherland Paper Co., 96 F.2d 675 (6th Cir. 1938), the court rejected process claims as obvious, then turned to the product claim: "Appellants frankly concede that the claims define [the product] in terms of the process. While this may properly be done when the product itself is new . . . ., the conception of [the product] was far from new." Id. at 676.

29. The definition in the claims is in terms of the extent of partial chlorination of 10 to 35 mole percent, but that range is, as we understand the record, convertible to 85–95% LAS. See, e. g., A. 1515.

30. Presumably, some small portion of the impurities would have no detergent properties at all and consequently would not have to biodegrade.

31. Tetralins have a cyclic structure; they are formed when two carbon atoms of a benzene react with a single paraffin, forming a carbon chain link between the two carbon atoms of the benzene ring. See PX–39, A. 1117; A. 501. Since the formation of alkyl tetralins requires two reactive sites on the paraffin chain, the precursor is at least a dichloride. The bi-, tri- and polychlorides can also acquire more than one benzene ring (A. 163) and, by virtue of the increased weight, would be removed from the product in the third stage fractional distillation. See column 7, lines 54–56.

32. If it makes a critical difference at all, it would be at the lower range of the product claimed by plaintiff, where the

deed, in the purest form claimed, the product would be a success even if the tetralins did not biodegrade at all. Regardless of whether or not the properties of the alkyl tetralins were nonobvious, the essential characteristics of the product as a whole were obvious.

It is true that the success of the product could not be determined with absolute certainty until it was field tested in an actual sewage plant. This fact, however, does not render the entire range of product described in the claims nonobvious.[33] Even though the sewage plant is far removed from the laboratory, the prior art, based mostly on laboratory work, pointed directly toward plaintiff's work. While plaintiff should be

commended for the commercial development of a socially desirable product, it has not earned the reward of a monopoly. As a matter of patent law, its work, must be regarded as routine experimentation and testing of an obvious product.[34]

The evidence supporting the conclusion that the subject matter of the invention as a whole was obvious is, in our opinion, plainly sufficient to overcome the presumption of validity resulting from the allowance of the three product claims after the application or its parent had been under study in the Patent Office for almost six years. The judgment is

Reversed.

33. Indeed, before the plaintiff learned for certain that the product would completely solve the foam problem, it filed the patent application and expedited the design and construction of new production facilities. A. 1804–1805. Continental apparently believed that it would be a good product competitively and should be marketed as soon as possible. In short, certainty that the product would completely solve the foam problem was not needed to support either the patent application or the commercial development of the product. Consequently, even though the exact rate of decomposition in a sewage treatment plant could not be precisely predicted, the subject matter of the claims, as a whole, was obvious.

34. "In the light of all this it seems to us that the patent does not rest upon an authentic invention, but upon one of those steps in an art which demand only patient experiment . . . . Ordinarily invention demands more than that; some resumption of a line of experiment from which the art had looked away . . . ., some departure which required originality or independence of conception; something more than routine testing of obvious combinations." Ruben Condenser Co. v. Aerovex Corp., 77 F.2d 266, 267–288 (2d Cir. 1935) (L. Hand, J.).

alkyl tetralins represent more than 10% of the product. Even if claims narrowly limited to a range of 85%, or just above, would be valid, for plaintiff to prevail, the subject matter of the claims "as a whole" must have been nonobvious. Moreover, the record suggests a basis for doubting the nonobviousness of the discovery. The Hammerton article (A. 1609) teaches:

"If the alkyl group has a straight chain, the compound is susceptible to biochemical oxidation, but if the alkyl group is branched, then bacterial degradation will either be delayed or substantially resisted according to the degree of branching. Highly or multi-branched alkyl groups appear to confer stability upon the detergent molecule." A. 1616. Thus, the prior art suggests that the more complex the structure, the more stable the molecule would be; and, conversely, the simpler the structure, the better the biodegradability. While it is true that the prior art had not specifically addressed the biodegradability of alkyl tetralins, it is apparent that a cyclic structure is more simple than a multi-branched structure. In this light, biodegradability of the alkyl tetralins might well have been anticipated even if the rate of biodegradability of tetralins was unknown.